¶ 1. Appellant Daniel Burson was indicted by a Jones County grand jury on one count of manslaughter. Following a trial, the jury found Burson guilty. The circuit court sentenced Burson to serve the maximum term of twenty years imprisonment in the custody and control of the Mississippi Department of Corrections. Aggrieved, Burson cites the following issues on appeal:
 I. THAT THE OVERWHELMING WEIGHT OF THE EVIDENCE IS THAT THE KNIFE PLACED INTO EVIDENCE BELONGING TO THE DEFENDANT WAS 2 CENTIMETERS LONGER THAN THE KNIFE THAT ENTERED THE VICTIM, AS THE STAB WOUND INDICATED THAT THE KNIFE USED WAS 5 CENTIMETERS AND A GUARD IMPRINT WAS ON THE VICTIM'S CHEST, INDICATING THAT THE KNIFE HAS BEEN DRIVEN AS FAR AS IT WOULD GO;
 II. THAT THE INDICTMENT CHARGES THAT ONE RUSTY COLLINS WAS KILLED WHEN IN FACT THE STATE'S EVIDENCE ONLY SHOWS A GASTON LAVELLE COLLINS BEING KILLED ON THE NIGHT IN QUESTION; AND
 III. THAT THE COURT FAILED TO REMOVE FROM THE JURY POOL FOR CAUSE ONE BOBBY THOMPSON, WHO STATED THAT HE HAD KNOWN RUSTY COLLINS['S] FAMILY AS WELL AS RUSTY COLLINS ALL HIS LIFE AND HAD COACHED HIM IN LITTLE LEAGUE WHEN HE WAS A 12-YEAR-OLD BOY.
 I. FACTS
¶ 2. On a cold, foggy New Year's Eve night, December 31, 1996, Pam Walters and her husband hosted a party which ended in tragedy for two families. The beer was flowing, the fireworks were popping, and children were running about in carefree celebration of the year to come. As midnight approached, the men, wishing to usher in the new year by firing guns into the air, removed themselves from the presence of the children by ambling over to Tony and Tina Daughtrey's house next door. As the night wore on and the children tired, two little girls began to cry because their parents said "no" to their desire to spend the night with one another. One of these girls was appellant Daniel Burson's daughter.
¶ 3. Party guest Gaston Lavelle "Rusty" Collins, Jr. observed that the crying girls were "about like a bunch of kids." Burson, at hearing what he perceived to be an unfriendly castigation of his daughter, retorted, "[T]hat's my kids you're talking about." These words escalated into a tempestuous exchange of obscenities which prompted Tony Daughtrey to expel everyone from his yard. Acutely aware that the party was winding down, guests removed themselves to their various vehicles. Burson proceeded to his van, in which his wife and children waited, intending to drive home. Rusty, with his adult son, Gaston Lavelle Collins, III, made his way back to the Walterses' yard. Rusty continued to mumble and ostensibly challenged Burson to fight. Burson, who was halfway into his van by this time, ran after Rusty and wrestled him to the ground. At one point during the tragic scuffle, several witnesses heard Rusty exclaim: "He's stabbing me, *Page 832 
he's stabbing me!" Lavelle pulled his father and Burson apart and restored his father to his feet. Rusty tugged his shirt up, exposing several bleeding stab wounds. One witness, Lashonda McLemore, testified that Rusty was blanketed with blood. Burson was clutching a knife.
¶ 4. Burson reentered his van and drove himself and his family home; he went to bed. Lavelle drove his wounded father to the hospital where his father died. An autopsy revealed that Rusty, who had suffered four stab wounds and three slash wounds in the struggle, died from a wound that entered his chest and pierced his heart. Two or three hours into Burson's slumber, the police arrived to arrest Burson for the stabbing death of Rusty Collins.
¶ 5. Burson gave two statements to the police and he testified at trial. In his first statement, Burson explained that Rusty came at him with a knife. Burson maintained that he did not want the knife in him, so he pushed it into Rusty. In Burson's second statement, he did not mention that Rusty had a knife; instead, he admitted that he pulled his own knife and inserted it "a little" into Rusty. At trial, Burson testified he pulled his own knife and again declared that Rusty had brandished a knife. One witness saw Burson wielding a knife when he and Rusty were pulled apart. No one who witnessed the fight saw Rusty with a knife.
¶ 6. Investigator Mackie Knight, an employee of the Jones County Sheriff's Department, investigated the homicide. He testified that Rusty had a knife in his possession and that the outside of the knife was covered in blood. Knight did not take Rusty's knife into possession; instead, he turned the knife over to Rusty's family members. Knight explained that he did not secure the knife because there was no evidence of the victim having any type of weapon during the fight. Knight testified that he secured a knife from Burson's home upon Burson's wife's request. This knife, which Burson stipulated belonged to him, was located on top of a kitchen cabinet wrapped in towel. The crime lab analysis revealed human blood on the knife; however, the lab could not type the blood. There were no fingerprints on Burson's knife.
 II. LAW AND ANALYSIS
I. DID THE OVERWHELMING WEIGHT OF THE EVIDENCE ESTABLISH THAT BURSON'S KNIFE COULD NOT HAVE CAUSED THE FATAL WOUND?
¶ 7. The knife that caused the fatal wound left a guard imprint which, Burson claims, indicates that it had been fully inserted into Rusty's body. Burson argues that the blade of his knife was longer than the wound; therefore, it would have caused a deeper wound. Though not artfully stated, Burson's argument boils down to a complaint that the guilty verdict is against the overwhelming weight of the evidence because there was a reasonable doubt whether his knife caused the fatal wound.
¶ 8. When a party claims that the verdict is against the overwhelming weight of the evidence, he is in essence alleging that the trial court erred in overruling that party's motion for new trial. Wetz v. State, 503 So.2d 803, 812 (Miss. 1987). "New trial decisions rest in the sound discretion of the trial court, and the motion should not be granted except to prevent an unconscionable injustice. We reverse only for abuse of discretion, and on review we accept as true all evidence favorable to the State." McClain, 625 So.2d at 781 (citing Wetz, 503 So.2d at 807-08). The jury is responsible for weighing and considering conflicting evidence and witness credibility and deciding whose testimony to believe. Id.
¶ 9. Accepting as true all evidence favorable to the State, the verdict was not against the overwhelming weight of the evidence. Dr. Steven Hayne, accepted without objection as an expert in forensic *Page 833 
pathology, testified that he performed an autopsy on Rusty. Dr. Hayne concluded that Rusty died from a knife wound which entered the left side of his chest and pierced his heart. At trial, Dr. Hayne examined Burson's knife and testified that it could have caused the fatal wound. Burson did not offer any expert testimony to controvert Dr. Hayne's opinion that Burson's knife could have caused the fatal wound. Further, Burson did not question Dr. Hayne more specifically about the length of Burson's knife relative to the depth of the wound.
¶ 10. While Burson's statements and trial testimony were fraught with inconsistencies, he was clear on one point: he stabbed Rusty with a knife. Several witness heard Rusty exclaim "he's stabbing me," and one witness saw Burson wielding a knife immediately after the altercation. Several witnesses saw the stab wounds after Rusty was pulled to his feet. Burson's knife had human blood on it. No one at the scene saw Rusty with a knife, and Burson did not suffer any wounds other than a superficial cut on his thumb. While he may have been provoked by words uttered by Rusty, several witnesses testified that Burson was the first to make physical contact by running across the yard and tackling Rusty to the ground. Given the forensic evidence, the uncontroverted opinion of the only expert who testified at trial, and the plethora of witnesses naming Burson as the physical antagonist, there was an abundance of evidence to indicate that Burson administered the fatal wound. The guilty verdict was not against the overwhelming weight of the evidence, and the trial court did not abuse its discretion in denying Burson's motion for new trial.
II. DID THE TRIAL COURT ERR IN OVERRULING BURSON'S MOTION TO DISMISS THE INDICTMENT AND IN ALLOWING THE STATE TO AMEND THE INDICTMENT TO REFLECT THE VICTIM'S GIVEN NAME?
¶ 11. The indictment charged Burson with killing Rusty Collins. During the course of trial it was discovered that "Rusty" was the victim's nickname; the victim's legal name was Gaston Lavelle Collins, Jr. After the State rested its case, Burson moved to dismiss the indictment on the ground that Burson was charged with killing Rusty Collins, and the only proof at trial was that Gaston Lavelle Collins, Jr. was killed. The trial court overruled Burson's motion to dismiss the indictment and allowed the State to amend the indictment by adding "Gaston Collins, Jr. a/k/a Rusty Collins." ¶ 12. Burson argues that the trial court erred in overruling his motion to dismiss the indictment and in granting the State's motion to amend the indictment. The only authority Burson cited in his brief on this issue was Burchfield v. State,277 So.2d 623 (Miss. 1973), which stands for the general proposition that an accused has a constitutional right to be informed of the nature and material elements of the charges against him. Burson argues that the name of the victim is an essential and material element, and the failure of the indictment to accurately name the victim warrants dismissal of the indictment. Burson further complains that changing the name of the victim by amending the indictment is a substantive change which the law does not allow.
¶ 13. Miss. Code Ann. § 99-17-13 (Rev. 1994) delineates the circumstances under which an indictment may be amended:
 Whenever, on the trial of an indictment for any offense, there shall appear to be any variance between the statement in the indictment and the evidence offered in proof thereof . . . in the name or description of any person, body politic or corporate, therein stated or alleged to be injured or damaged . . . or in the Christian name or surname, or both, or other description whatever, of any person whomsoever, therein named or described . . . it shall and may be lawful for the court before which the trial shall *Page 834 
be had, if it shall consider such variance not material to the merits of the case, and that the defendant cannot be prejudiced thereby in his defense on the merits, to order such indictment and the record and proceedings in the court to be amended according to the proof, whenever it may be deemed necessary by the court to amend such indictment, record, and proceedings on such terms as to postponing the trial, to be had before the same or another jury, as the court shall think reasonable. After such amendment, the trial shall proceed in the same manner, and with the same consequences in all respects, as if a variance had not occurred; but if the court shall, on application, refuse a continuance, the defendant may take a bill of exceptions thereto, and assign such refusal for error.
¶ 14. Amendments to indictments are allowed when they are of form and not substance. Rhymes v. State, 638 So.2d 1270, 1275 (Miss. 1994). The test for whether a change is one of form or substance is: "[W]hether the defense as it originally stood would be equally available after the amendment is made." Eakes v. State,665 So.2d 852, 859-60 (Miss. 1995). In Evans v. State, 425 So.2d 1043, 1045 (Miss. 1983), the court ruled that the trial court did not err when it allowed an amendment to an indictment changing the surname of the victim from Johnson to Johns. In Evans v. State,499 So.2d 781 (Miss. 1986), the court upheld an amendment to an indictment changing a corporate victim's name from Madison Ecol Station to its parent company, Emerald Marketing, Inc.
¶ 15. In the case sub judice, changing the indictment to include Rusty's legal name, in addition to his nickname, was a change of form and not of substance. The amendment was not material to the merits of the case and it did not alter Burson's defense in any manner; therefore, Burson experienced no prejudice in his defense on the merits. There is no question that Burson knew that Rusty Collins and Gaston Collins were one and the same, or any indication that Burson was confused regarding the victim's identity. For instance, every trial witness, except Dr. Hayne, referred to the victim as "Rusty Collins." Dr. Hayne referred to the victim as Gaston Collins, but responded to questions naming the victim as Rusty Collins, Gaston Collins, and Gaston Rusty Collins interchangeably. In short, Burson was not confused as to the identity of the person he was accused of killing and did not have to alter his defense after Dr. Hayne referred to the victim as "Gaston" instead of "Rusty." Since the requested amendment was for form only, the trial court did not err in allowing the amendment and did not err in overruling Burson's motion to dismiss the indictment.
III. DID THE COURT ERR IN FAILING TO REMOVE JUROR BOBBY THOMPSON FOR CAUSE?
¶ 16. Juror Bobby Thompson stated the following on voir dire: he had been the Collinses' mail carrier for thirty-five years, he had known Rusty Collins all of Rusty's life, and he had coached Rusty in Little League baseball when Rusty was twelve years old. Thompson stated he could be a fair and impartial juror despite his familiarity with the Collins family. Burson is aggrieved that the trial court did not dismiss Thompson from the venire for cause. Thompson served on the petit jury.
¶ 17. When Burson questioned the venire members during voir dire, he did not inquire any further into Thompson's connection with Rusty or the Collins family. The only question Burson specifically asked Thompson concerned a prior criminal trial in which Thompson served as a juror. Burson never challenged Thompson for cause or peremptorily. Thompson was juror number three on the first panel, so Burson had an available peremptory challenge to remove Thompson had Burson really been concerned about bias.
¶ 18. In Jaco v. State, 574 So.2d 625, 633-34 (Miss. 1990), a capital murder case *Page 835 
involving two defendants, a juror who knew the sheriff stated on voir dire that he could not be fair. Neither defendant challenged the juror for cause or peremptorily. On appeal, the defendants claimed they were denied a fair trial because the juror served on the jury that voted to convict them. The court ruled that the defendants waived this point when they failed timely to challenge this juror either for cause or peremptorily." Id. In another capital murder case, Mack v. State,650 So.2d 1289, 1308 (Miss. 1994), the defendant appealed the trial court's failure to dismiss two jurors for cause despite his failure to challenge these jurors for cause or peremptorily. The court stated, "when the defendant fails to timely challenge the juror, either for cause or peremptorily, he waives this point." Id. (citing Jaco, 574 So.2d at 633-34). Since Burson did not challenge Thompson at trial, he waived his right to appeal Thompson's service on the jury. The trial court did not err by not removing Thompson for cause.
¶ 19. Finding no error on any of the issues Burson raised, we affirm the judgment of the trial court.
¶ 20. JUDGMENT OF THE JONES COUNTY CIRCUIT COURT OF CONVICTION OF ONE COUNT OF MANSLAUGHTER AND SENTENCE OF TWENTY YEARS IMPRISONMENT TO BE SERVED IN THE MISSISSIPPI DEPARTMENT OF CORRECTIONS IS AFFIRMED. COSTS ARE ASSESSED TO JONES COUNTY.
McMILLIN, C.J., KING AND SOUTHWICK, P. JJ., BRIDGES, DIAZ, IRVING, LEE, PAYNE, AND THOMAS, JJ., CONCUR.